**16 MAG 3433**

Approved: _Rebecca Mermelstein_
REBECCA MERMELSTEIN
Assistant United States Attorney

Before:   HONORABLE GABRIEL W. GORENSTEIN
          United States Magistrate Judge
          Southern District of New York

[U.S. DISTRICT COURT FILED MAY 27 2016 S.D. OF N.Y.]

- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :   SEALED COMPLAINT
                                :
        - v. -                  :   Violations of
                                :   18 U.S.C. §§ 1349, 1343,
STEVEN MCCLATCHEY,              :   1348 & 2
                                :
        Defendant.              :   COUNTY OF OFFENSES:
                                :   New York
- - - - - - - - - - - - - - - - x

DOC #_____

SOUTHERN DISTRICT OF NEW YORK, ss.:

MATTHEW CALLAHAN, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

### COUNT ONE
### (Conspiracy to Commit Securities and Wire Fraud)

1.   From at least in or about February 2014 through at least in or about September 2015, in the Southern District of New York and elsewhere, STEVEN MCCLATCHEY, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, (a) securities fraud, in violation of Title 18, United States Code, Section 1348; and (b) wire fraud, in violation of Title 18, United States Code, Section 1343.

2.   It was a part and object of the conspiracy that STEVEN MCCLATCHEY, the defendant, and others known and unknown, knowingly and intentionally would and did execute a scheme and artifice to (a) defraud persons in connection with securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to

file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, in violation of Title 18, United States Code, Section 1348.

3.   It was further a part and an object of the conspiracy that STEVEN MCCLATCHEY, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Wire Fraud)

4.   From in or about February 2014 through in or about September 2015, in the Southern District of New York, and elsewhere, STEVEN MCCLATCHEY, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MCCLATCHEY defrauded the investment bank that employed him ("Investment Bank A") and its clients of valuable confidential information by deceptively converting that information to his own use in breach of fiduciary and other duties owed to Investment Bank A and its clients, using wire communications and national securities exchanges, and by providing that information to a co-conspirator not named herein ("CW-1") knowing that CW-1 would use the information to purchase securities of, among other publicly traded companies, Forest Oil Corporation, Questcor Pharmaceuticals, Inc., Zygo Corporation, Pepco Holdings, Inc., Measurement Specialties, Inc., Entropic Communications, Inc., PetSmart, Inc., Emulex Corporation,

Omnicare, Inc., and TECO Energy, Inc..

(Title 18, United States Code, Sections 1343 and 2.)

## COUNTS THREE TO THIRTEEN
### (Securities Fraud)

5. On the dates set forth below, in the Southern District of New York, and elsewhere, STEVEN MCCLATCHEY, the defendant, knowingly and intentionally executed a scheme and artifice to (a) defraud persons in connection with securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, to wit, MCCLATCHEY provided by CW-1 with material, non-public information that MCCLATCHEY obtained as part of his employment, and CW-1 used that information to execute the securities transactions listed below.

| Count | Order Date(s) | Security |
|---|---|---|
| Three | March 31, 2014 | Forest Oil Corporation |
| Four | April 4, 2014 | Questcor Pharmaceuticals, Inc. |
| Five | April 10, 2014 | Zygo Corporation |
| Six | April 28, 2014 | Pepco Holdings, Inc. |
| Seven | May 30, 2014 | Measurement Specialties, Inc. |
| Eight | September 4 and 5, 2014 | Entropic Communications, Inc. |
| Nine | November 18, 2014 | PetSmart, Inc. |
| Ten | January 26, 2015 | Entropic Communications, Inc. |
| Eleven | February 23 and 24, 2015 | Emulex Corporation |
| Twelve | May 18, 2015 | Omnicare, Inc. |
| Thirteen | August 25, 2015 | TECO Energy, Inc. |

(Title 18, United States Code, Sections 1348 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

6. I have been a Special Agent with the FBI for approximately 7 years. I am currently assigned to a squad responsible for investigating violations of the federal securities laws and related offenses. I have participated in investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

7. The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including, but not limited to: (a) business records and other documents, including trading records and records of electronic communications provided by various entities; (b) publicly available documents; (c) conversations with representatives from the United States Securities and Exchange Commission ("SEC") and Investment Bank A; and (d) interviews with CW-1.[1] Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all of the facts that I have learned during the course of my investigation. Where the contents of documents and the actions and statements of and conversations with others are reported herein, they are reported in substance and in part. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

### Relevant Entities and Individuals

8. At all times relevant to this Complaint:

   a. Investment Bank A was the investment banking advisory arm of a global bank headquartered in London, England.

   b. From at least in or about December 2008 through in or about December 2015, STEVEN MCCLATCHEY, the defendant, was a Director in the Manhattan offices of Investment Bank A.

9. At all times relevant to this Complaint, CW-1 was a

---

[1] On or about May 27, 2016, CW-1 pleaded guilty, pursuant to a cooperation agreement, to charges relating to the conduct set forth herein. CW-1 is cooperating with the Government in the hopes of obtaining leniency at sentencing. CW-1 has thus far provided reliable and credible information that has been corroborated.

4

plumber working in Long Island, New York and was a friend of STEVEN MCCLATCHEY, the defendant.

   10. At all times relevant to this Complaint:

      a. Forest Oil Corporation ("Forest Oil") was a publicly-traded oil and gas producer headquartered in Colorado. Forest Oil's securities traded under the symbol "FST" on the New York Stock Exchange ("NYSE").

      b. Sabine Oil & Gas LLC ("Sabine") was an oil and gas producer headquartered in Texas. Sabine's securities were not publicly traded until it merged with Forest Oil as described in further detail below.

      c. Questcor Pharmaceuticals, Inc. ("Questcor") was a publicly-traded pharmaceutical company headquartered in California. Questcor's securities traded under the symbol "QCOR" on the National Association of Securities Dealers Automated Quotations ("NASDAQ").

      d. Mallinckrodt PLC ("Mallinckrodt") was a publicly-traded pharmaceutical company headquartered in the United Kingdom. Mallinckrodt's securities traded under the symbol "MNK" on the NYSE.

      e. Zygo Corporation ("Zygo") was a publicly-traded provider of optical metrology solutions, high precision optics, and optical assemblies and was headquartered in Connecticut. Zygo's securities traded under the symbol "ZIGO" on the NASDAQ.

      f. AMETEK, Inc. ("AMETEK") was a publicly-traded manufacturer of electronic instruments and electro-mechanical devices headquartered in Pennsylvania. AMETEK'S securities traded under the symbol "AME" on the NYSE.

      g. Pepco Holdings, Inc. ("Pepco") was a publicly-traded energy provider to the Mid-Atlantic region headquartered in Washington, D.C. Pepco's securities traded under the symbol "POM" on the NYSE.

      h. Exelon Corporation ("Exelon") was a publicly-traded national energy provider headquartered in Illinois. Exelon's securities traded under the symbol "EXC" on the NYSE.

      i. Measurement Specialties, Inc. ("Measurement") was a publicly-traded provider of sensors and sensor based systems and was headquartered in Virginia. Measurement's securities traded under the symbol "MEAS" on the NASDAQ.

j.  TE Connectivity Ltd. ("TE Connectivity") was a publicly-traded provider of connectivity solutions for a variety of industries and was headquartered in Switzerland. TE Connectivity's securities traded under the symbol "TEL" on the NYSE.

k.  Entropic Communications, Inc. ("Entropic") was a publicly-traded provider of semiconductor solutions and was headquartered in California. Entropic's securities traded under the symbol "ENTR" on the NASDAQ.

l.  MaxLinear, Inc. ("MaxLinear") was a publicly-traded provider of analog and semi-conductor solutions for broadband communications and was headquartered in California. MaxLinear's securities traded under the symbol "MXL" on the NYSE.

m.  PetSmart, Inc. ("PetSmart") was a publicly-traded specialty pet retailer headquartered in Arizona. PetSmart's securities traded under the symbol "PETM" on the NASDAQ.

n.  BC Partners was a private equity firm headquartered in London, England.

o.  Emulex Corporation ("Emulex") was a publicly-traded network connectivity specialist headquartered in California. Emulex's securities traded under the symbol "ELX" on the NYSE.

p.  Avago Technologies ("Avago") was a publicly-traded supplier of semiconductor devices headquartered in Singapore. Avago's securities traded under the symbol "AVGP" on the NASDAQ.

q.  Omnicare, Inc. ("Omnicare") was a publicly-traded provider of pharmacy-related services to long term care facilities and was headquartered in Ohio. Omnicare's securities traded under the symbol "OCR" on the NYSE.

r.  CVS Health Corporation ("CVS") was a publicly-traded pharmacy retailer headquartered in Rhode Island. CVS's securities traded under the symbol "CVS" on the NYSE.

s.  TECO Energy, Inc. ("TECO") was a publicly-traded energy company headquartered in Florida. TECO's securities traded under the symbol "TE" on the NYSE.

t.  Emera, Inc. ("Emera") was a publicly-traded

energy company headquartered in Nova Scotia. Emera's securities traded under the symbol "EMA" on the Toronto Stock Exchange ("TSX").

    u.    Duke Energy Corporation was a publicly-traded electric power holding company headquartered in North Carolina. Duke's securities traded under the symbol "DUK" on the NYSE.

### Summary of the Insider Trading Scheme

    11.    As set forth below, there is probable cause to believe that STEVEN MCCLATCHEY, the defendant, provided material non-public information (the "Inside Information") about impending mergers and acquisitions that MCCLATCHEY acquired as part of his employment at Investment Bank A to CW-1 with the knowledge and understanding that CW-1 would make and cause to be made profitable trades in the target companies prior to the public announcement of those deals.

    12.    Specifically, in advance of and in connection with more than ten separate mergers and acquisitions, STEVEN MCCLATCHEY, the defendant, tipped CW-1 with Inside Information. MCCLATCHEY learned about the deals as part of his employment with Investment Bank A, which generally advised either (i) the company to be acquired in the transaction; (ii) the acquiring company; or (iii) a company which ultimately lost a bid to acquire the company involved in the transaction.

    13.    Having learned the secret information about these impending transactions, STEVEN MCCLATCHEY, the defendant, in breach of fiduciary duties and other duties of trust and confidence owed to Investment Bank A and its client, tipped CW-1 so that CW-1 could use the information to CW-1's pecuniary advantage and with the expectation that CW-1 would confer a benefit upon MCCLATCHEY. Among the benefits that MCCLATCHEY received as part of the insider trading scheme were thousands of dollars of cash payments by CW-1 and the provision of home renovation services.

    14.    CW-1 used the Inside Information that he received from STEVEN MCCLATCHEY, the defendant, to make profitable trades in a brokerage account in CW-1's name and in a joint brokerage account held in CW-1 and CW-1's spouse's name. CW-1 reaped approximately $76,000 in ill-gotten gains from this scheme.

## Information Provided By Investment Bank A

### Investment Bank A's Insider Trading Policy

15. Based on a review of records supplied by Investment Bank A, I have learned that:

   a. At all times relevant to this Complaint, Investment Bank A had written policy statements, which were distributed to all relevant personnel, that prohibited the use of material, non-public information received during the course of employment to trade in any security or to advise anyone else to trade in any security based on such non-public information.

   b. Investment Bank A's policy statement defined "confidential information" as including "information of a non-public nature provided by a third party to the firm or that is the firm's own information." The policy statement further provided that "[s]ome confidential information may also be deemed to be material non-public information ('MNPI') (also known as 'inside information')." The policy stated that three elements should be considered in determining whether information is MNPI: "(i) [w]hether the information is non-public (or not generally available); (ii) [w]hether the information if disclosed (or made generally available) would have or would be likely to have a significant impact on the price of any relevant securities and/or other instruments; and (iii) [w]hether a reasonable investor would be likely to use the information in making an investment decision."

   c. In the course of his employment, STEVEN MCCLATCHEY, the defendant, received specific training from Investment Bank A regarding the above-described policy statement.

### MCCLATCHEY'S Responsibilities

16. Based on my conversations with an employee of Investment Bank A as well as my review of documents provided by Investment Bank A, I have learned the following:

   a. As part of his job responsibilities, STEVEN MCCLATCHEY, the defendant, was tasked with tracking all potential mergers and acquisitions in which Investment Bank A was involved. In connection with this responsibility, MCCLATCHEY was notified when Investment Bank A ran a conflict check for a new potential client, when an engagement letter was signed, and when the Fairness Opinion Committee ("FOC") met.

8

  b. MCCLATCHEY also communicated directly - both by phone and email - with bankers assigned to particular mergers or acquisitions about the stage of a deal, the fees for such a deal, and the likely timing of any announcement.

  c. MCCLATCHEY summarized this information in a section of a weekly document called the "M&A Global Weekly Business Update" (the "Weekly Update"), which was distributed to various employees of Investment Bank A. MCCLATCHEY's section of the Weekly Update, among other things, tracked the signing of certain engagement letters, which deals were likely to be announced to the public the following week (listed in a section titled "Expected Next Week"), which were likely to be announced to the public in the near future (listed in a section titled "Potential Announcements"), and which were still in progress.

### INFORMATION PROVIDED BY CW-1

  17. Based on my conversations with CW-1, I know the following:

  a. CW-1 is a plumber in Long Island, New York.

  b. CW-1 maintains a brokerage account in CW-1's own name at a brokerage firm (the "CW-1 Account"). CW-1 also maintains a joint brokerage account with CW-1's spouse at another brokerage firm (the "CW-1 Joint Account").

  c. CW-1 owns a boat which is docked at a marina in Long Island (the "Marina"). STEVEN MCCLATCHEY, the defendant, also owns a boat, which he also docks at the Marina. CW-1 and MCCLATCHEY met at the Marina in approximately 2011 or 2012 and became friends.

  d. CW-1 understood that MCCLATCHEY worked at Investment Bank A and was involved in mergers and acquisitions.

  e. By approximately 2013, it was CW-1 and MCCLATCHEY's habit to spend most Saturdays together at the Marina or on their boats. In the winter, they also spent Saturdays in MCCLATCHEY's garage, playing pool and watching sports.

  f. In approximately 2013 or 2014, MCCLATCHEY first provided CW-1 with a tip about an impending merger or acquisition. More specifically, MCCLATCHEY told CW-1 to keep an

eye on a particular company because something good was going to happen. MCCLATCHEY warned CW-1 not to tell anyone, even CW-1's spouse, about the tip.

       g.    After the first tip, MCCLATCHEY continued to tip CW-1, typically in the same manner. CW-1 understood that MCCLATCHEY was providing him with non-public information about impending deals that MCCLATCHEY had learned from his position at Investment Bank A. CW-1 purchased securities in the following companies, among others, based on MCCLATCHEY's tips: Forest Oil, Questcor, Zygo, Pepco, Measurement, Entropic, PetSmart, RTI, Emulex, Omnicare and TECO.

       h.    In each instance, after MCCLATCHEY's tip bore fruit, CW-1 paid MCCLATCHEY. In some instances, CW-1 paid MCCLATCHEY by placing cash in a gym bag that MCCLATCHEY brought to the Marina. In other instances, CW-1 handed the cash directly to MCCLATCHEY in MCCLATCHEY's garage.

       i.    In addition to the cash payments, CW-1 repaid MCCLATCHEY by providing free professional services.

### Specific Instances of Insider Trading

    18.    Based on my review of (a) documents, including e-mail communications, supplied by Investment Bank A; (b) trading records for the CW-1 Account and CW-1 Joint Account; (c) publicly-available documents, including SEC filings; and (d) my participation in interviews of CW-1, I have learned the following, in substance and in part:

#### Insider Trading in Forest Oil

    19.    In or about February 2014, Investment Bank A began discussions with Sabine about the possibility of representing Sabine in connection with a merger with or acquisition of Forest Oil.

    20.    On or about February 14, 2014, STEVEN MCCLATCHEY, the defendant, received an email attaching the "Weekly IBD Conflict Checks," which listed client "Sabine Oil & Gas LLC," and described the transaction as, "[p]roposed merger between Sabine Oil and Gas and Forest Oil Corporation. Likely structured as a merger of equals, with an all-stock consideration exchanged and the combined management and board split between the two parties."

21. For each of the weeks between March 14 and March 28, 2014, the section of the Weekly Update authored by STEVEN MCCLATCHEY, the defendant, discussed the progress of the Sabine/Forest Oil merger. For example, the Weekly Update for March 28, 2014 listed the announcement of the "Sabine Oil & Gas, LLC - $1.6 bn acquisition of Forest Oil Corp." as "Expected Next Week."

22. On or about the morning of Monday, March 31, 2014, based on Inside Information provided by STEVEN MCCLATCHEY, the defendant, CW-1 purchased 12,000 shares of Forest Oil in the CW-1 Account at a total cost of $22,929.99. CW-1 had never purchased Forest Oil stock for this account before.

23. On or about May 6, 2014, before the opening of the market, Sabine and Forest Oil announced the signing of a definitive merger agreement. By market close that day, Forest Oil's stock price had risen approximately 13.4% from the close of the prior trading day, to approximately $2 per share.

## Insider Trading in Questcor

24. In or about January 2014, Investment Bank A began discussions with Mallinckrodt about the possibility of representing Mallinckrodt in a merger with Questcor.

25. On or about January 31, 2014, STEVEN MCCLATCHEY, the defendant, received an email attaching the "Weekly IBD Conflict Checks," which listed client "Mallinckrodt, LLC" and described the transaction as "IB: Potential merger of Mallinckrodt and Questcor. Mallinckrodt, LLC manufactures and distributes products used in diagnostic procedures, and in the treatment of pain and related conditions and is owned by Mallinckrodt PLC. Questcor Pharmaceuticals, Inc. a biopharmaceutical company, provides drugs for the treatment of multiple sclerosis, nephrotic syndrome, and infantile spasms indications."

26. On or about February 21, 2014, STEVEN MCCLATCHEY, the defendant, received an email with the subject line "M&A vertical report thru January-14" which stated, in pertinent part, that "Mallinckrodt is in talks with Questcor for a $4b MOE" and that Investment Bank A was working to put together a proposal.

27. The section of the Weekly Update for March 28, 2014 authored by STEVEN MCCLATCHEY, the defendant, listed "Mallinckrodt - Acq of Questcor Pharmaceuticals" as a "Potential Announcement" and described the status as "[n]egotiated deal FOC

meet 4/3 tracking toward 4/7 announcement date."

28. On or about Friday, April 4, 2014, based on Inside Information provided by STEVEN MCCLATCHEY, the defendant, CW-1 purchased 425 shares of Questcor in the CW-1 Account at a total cost of $30,142.49. CW-1 had never purchased Questcor stock for this account before.

29. On or about April 7, 2014, before the opening of the market, Questcor announced that it had agreed to be acquired by Mallinckrodt. By market close that day, Questcor's stock price had risen approximately 18.7% from the close of the prior trading day, to $80.58 per share.

### Insider Trading in ZYGO

30. In or about September 2013, Investment Bank A began discussions with Zygo about the possibility of representing Zygo in connection with another company's potential acquisition of Zygo.

31. On or about September 13, 2013, STEVEN MCCLATCHEY, the defendant, received an email attaching the "Weekly IBD Conflict Checks," which listed the client "Zygo Corporation," and described the project as "[p]itching a sellside advisory role for Zygo Corporation, which designs, develops, and manufactures ultra-high precision measurement solutions, and optical sub-systems and components for original equipment manufacturers and end-user applications worldwide."

32. For each of the weeks between January 31, 2014 and April 4, 2014, the section of the Weekly Update authored by STEVEN MCCLATCHEY, the defendant, discussed the progress of the Zygo deal. For example, the Weekly Update for April 4, 2014 described the "Zygo Corp" transaction as an announcement "Expected Next Week."

33. During that time period, STEVEN MCCLATCHEY, the defendant, kept abreast of progress on the Zygo deal by, among other things, communicating with other employees of Investment Bank A by email. For example:

a. On or about February 12, 2014, MCCLATCHEY sent an email to another employee of Investment Bank A seeking to "check in on Zygo to see if the final bid date has been set for Feb. 27" and stating "I don't anticipate we'll have a signed deal for at least a week after that."

b. On or about April 8, 2014, MCCLATCHEY received an email from an employee of Investment Bank A stating, "[w]e are getting close on Project Matterhorn (sale of Zygo [C]orp). We are working towards a signing/announcement on Friday this week. We will be delivering the fairness opinion on Thursday . . . Do you have the final fully executed EL [engagement letter]? If so, would you mind sending to me."

34. On or about April 10, 2014, based on Inside Information provided by STEVEN MCCLATCHEY, the defendant, CW-1 purchased 700 shares of Zygo in the CW-1 Account at a total cost of $10,306.99. CW-1 had never purchased Zygo stock for this account before.

35. On or about April 11, 2014, before the opening of the market, Zygo announced that it had entered into a merger agreement with Ametek pursuant to which Ametek would acquire all outstanding shares of Zygo's common stock. By market close that day, Zygo's stock price had risen approximately 32.4% from the close of the prior trading day, to $19.43 per share.

Insider Trading in Pepco

36. In or about February 2014, Investment Bank A began discussions about the possibility of representing Exelon in a potential acquisition of Pepco.

37. On or about February 10, 2014, STEVEN MCCLATCHEY, the defendant, received an email attaching the "Weekly IBD Conflict Checks," which listed client "Exelon Corporation" and described the transaction as, "Exelon's CEO has approached the CEO of Pepco Holdings, Inc. (Power & Utilities) about a potential corporate acquisition. Pepco's CEO has publicly indicated that he intends to retire in the coming year, and has not rebuffed Exelon's advances."

38. On or about March 29, 2014, STEVEN MCCLATCHEY, the defendant, received an email from another Investment Bank A employee regarding "Exelon/[P]epco," which stated, "[w]e put in a good, all cash offer this week."

39. On or about April 24, 2014, STEVEN MCCLATCHEY, the defendant, sent an email to another Investment Bank A employee stating that "the other big one to be sensitive to is Exelon $12.5 bn acquisition of Pepco. Final bids due tomorrow, hoping to announce a deal week of May 5, we have a 50/50 shot."

40. The section of the Weekly Update for April 25, 2014 authored by STEVEN MCCLATCHEY, the defendant, listed "Exelon Corp - Acquisition of Pepco Holdings," as a "Potential Announcement," and described the status as, "FOC meet 4/22, final round bids due 4/25, target announce week of May 5."

41. On or about the morning of Monday, April 28, 2014, based on Inside Information provided by STEVEN MCCLATCHEY, the defendant, CW-1 bought 1,900 shares of Pepco in the CW-1 Account at a total cost of $41,657.99. CW-1 had never purchased Pepco stock for this account before.

42. On or about April 30, 2014, before the opening of the market, Exelon and Pepco announced that Exelon had agreed to buy Pepco for $6.8 billion in cash. By market close that day, Pepco's stock price had risen approximately 17.4% from the close of the prior trading day, to $26.76 per share.

### Insider Trading in Measurement

43. In or about March 2014, Investment Bank A began discussions with Measurement about the possibility of representing Measurement in a potential acquisition by TE Connectivity.

44. For each of the weeks between April 18, 2014 and May 30, 2014, the section of the Weekly Update authored by STEVEN MCCLATCHEY, the defendant, discussed the progress of the Measurement deal. For example, the Weekly Update for May 23, 2014 listed "Measurement Specialties - Sale to T.E." as a "Potential Announcement" and described the status as "FOC met 4/15 to evaluate offer from a strategic buyer, signed exclusivity, in diligence hope to sign by mid June."

45. On or about Friday, May 30, 2014, based on Inside Information provided by STEVEN MCCLATCHEY, the defendant, CW-1 bought 200 shares of Measurement in the CW-1 Account at a total cost of $12,831.99. CW-1 had never purchased Measurement stock for this account before.

46. On or about June 18, 2014, after the opening of the market, TE Connectivity announced that it would acquire Measurement. By market close the following day, Measurement's stock price had risen approximately 10.7% from the close of the trading on June 17, 2014, to $86.38 per share.

### Insider Trading in Entropic: Round I

47. In or about October 2013, Investment Bank A began discussions about the possibility of representing Entropic for the purpose of a possible sale of the company.

48. On or about August 27, 2014, STEVEN MCCLATCHEY, the defendant, sent an email to another Investment Bank A employee with the subject line "Project Manchuria," which was the code name assigned to the Entropic deal. In the email MCCLATCHEY wrote, "I wanted to confirm who the potential buyer is, estimate timing to get a deal signed & announced, status of our signed engagement letter, potential fee . . . If you can come back with some details or call me if easier, would be helpful to me."

49. The section of the Weekly Update for August 29, 2014 authored by STEVEN MCCLATCHEY, the defendant, listed "Entropic Communications - Sale" as a "Potential Announcement" and described the status as "FOC meet 9/2 to discuss public co valuation early stages w/10 strategics MaxLinear front of the pack . . ."

50. On or about the Thursday, September 4, 2014, based on Inside Information provided by STEVEN MCCLATCHEY, the defendant, CW-1 bought 2,600 shares of Entropic in the CW-1 Account at a total cost of $6,691.99. CW-1 had never purchased Entropic stock for this account before.

51. On or about Friday, September 5, 2014, based on Inside Information provided by STEVEN MCCLATCHEY, the defendant, CW-1 purchased 17,400 additional shares of Entropic in the CW-1 Account at a total cost of $45,249.99.

52. On or about September 16, 2014, before the opening of the market, Entropic announced that it had retained Investment Bank A to explore strategic alternatives. By market close that day, Entropic's stock price had risen approximately 7.3% from the close of the prior trading day, to $2.94 per share.

### Insider Trading in PetSmart

53. In or about September 2014, Investment Bank A began discussions about the possibility of representing PetSmart in a potential sale of PetSmart. These discussions did not ultimately culminate in a representation.

54. On or about November 7, 2014, STEVEN MCCLATCHEY, the

defendant, received an email from the "Conflicts Management/IBD Business Section" email address with subject "Conflict Check - Leveraged Finance – PETSMART." The email summarizing the deal specified "Client: BC Partners Inc" and described the transaction as "Providing non-exclusive financing to BC Partners for potential acquisition of PetSmart."

55. On or about Tuesday, November 18, 2014, based on Inside Information provided by STEVEN MCCLATCHEY, the defendant, CW-1 bought 800 shares of PetSmart in the CW-1 Account at a total cost of $58,745.99. CW-1 had never purchased PetSmart stock for this account before.

56. On or about December 14, 2014, after the opening of the market, PetSmart announced that it would be acquired by a consortium led by BC Partners. By market close the following day, PetSmart's stock price had risen approximately 4.2% from the close of trading on December 13, 2014, to $80.97 per share.

## Insider Trading in Entropic: Round II

57. In or about January 2015, Investment Bank A began discussions about the possibility of representing Entropic for the purpose of a possible sale of the company.

58. On or about January 9, 2015, STEVEN MCCLATCHEY, the defendant, received an email from the Global Conflicts Management email address regarding a conflict check for "Entropic Communications, Inc.," which described the transaction as, "IB: UPDATE TO A PREVIOUSLY CLEARED TRANSACTION: Maxlinear and Beijing JianGuang Asset Management Co, Ltd. are new potential buyers of Entropic. . ."

59. For the weeks January 16, 2015 and January 23, 2015, the section of the Weekly Update authored by STEVEN MCCLATCHEY, the defendant, discussed the progress of the Entropic deal. For example, the Weekly Update for January 23, 2015 listed "Entropic Communications - Sale to MaxLinear" as a "Potential Announcement" and described the status as "FOC meet 1/29/15, est deliver opinion to client week 2/9/15, est sign around that date, on track."

60. On or about January 26, 2015, based on Inside Information provided by STEVEN MCCLATCHEY, the defendant, CW-1 purchased 10,000 shares of Entropic in the CW-1 Account at a total cost of $26,309.99.

61. On or about February 3, 2015, before the opening of

16

the market, Entropic announced that it would be acquired by MaxLinear. By market close that day, Entropic's stock price had risen approximately 13.3% from the close of the prior trading day, to $3.06 per share.

### Insider Trading in Emulex

62. In or about January 2015, Investment Bank A began discussions about the possibility of representing Avago in a potential acquisition.

63. On or about January 20, 2015, STEVEN MCCLATCHEY, the defendant, received an email from the Global Conflicts Management email address regarding a conflict check for "Avago Technologies Limited," which described the transaction as, "IB: We have been asked by Avago to sign an NDA/joinder letter in connection with an upcoming potential acquisition of theirs on which they are looking to [Investment Bank A] to provide acquisition financing. At this point we do not know the name of the target."

64. On or about February 17, 2015, STEVEN MCCLATCHEY, the defendant, sent an email to another employee of Investment Bank A and asked, "Can you let me know if we have a potential signing/announcement date in mind for Emulex sometime after the upcoming FOC meeting? Also let me know if its ok to move the project to a verbal engagement..." The employee responded, "current plan is to announce February 25 after the market close concurrently with Avago's earnings release."

65. The section of the Weekly Update for February 20, 2015 authored by STEVEN MCCLATCHEY, the defendant, lists the announcement of the "Avago Technologies - $620m acquisition of Emulex Corporation" as "Expected Next Week."

66. On or about February 23, 2015, based on Inside Information provided by STEVEN MCCLATCHEY, the defendant, CW-1 purchased 10,000 shares of Emulex in the CW-1 Account for a total cost of $62,309.99. CW-1 had never purchased Emulex for this account before.

67. On or about February 24, 2015, based on Inside Information provided by STEVEN MCCLATCHEY, the defendant, CW-1 purchased an additional 3,000 shares of Emulex in the CW-1 Account for a total cost of $18,999.

68. On or about February 25, 2015, after the opening of the market, Avago announced that it was acquiring Emulex for

$606 million. By market close the next day, Emulex's stock price had risen approximately 24.79% from the close of the prior trading day, to $7.93 per share.

## Insider Trading in Omnicare

69. In or about March 2015, Investment Bank A began discussions about the possibility of representing CVS in a potential acquisition of Omnicare.

70. On or about March 5, 2015, STEVEN MCCLATCHEY, the defendant, received an email from the Global Conflicts Management email address regarding a conflict check for "CVS/Omnicare," which described the transaction as "CVS is looking to potentially acquire Omnicare (OCR) which is a provider of a broad array of pharmacy related services to long term care facilities and to other customers in the health care environment . . . proposed timing would be 3Q 15."

71. For the weeks of May 8, 2015 and May 15, 2015, the section of the Weekly Update authored by STEVEN MCCLATCHEY, the defendant, discussed the progress of the CVS/Omnicare deal. For example, the Weekly Update for May 8, 2015 lists "CVS Health Corporation – Acquisition of Omnicare" as a "Potential Announcement" and described the status as "[f]irst round bids due May 8 in a 3 horse race. Size & fee per system estimates at conflict check."

72. On or about May 18, 2015, based on Inside Information provided by STEVEN MCCLATCHEY, the defendant, CW-1 purchased 470 shares of Omnicare in the CW-1 Account for a total cost of $43,563. CW-1 had never purchased Omnicare for this account before.

73. On or about May 21, 2015, before the opening of the market, Omnicare announced that it was being acquired by CVS for $98 per share. By market close that day, Omnicare's stock price had risen approximately 1.7% from the close of the prior trading day, to $96.26 per share.

## Insider Trading in TECO

74. In or about June 2015, Investment Bank A began discussions about the possibility of representing Duke Energy Corporation in a potential acquisition of TECO.

75. On or about June 18, 2015, STEVEN MCCLATCHEY, the defendant, received an email from the Global Conflicts

Management email address concerning a conflict check for client Duke Energy Corporation and which described the project as "Duke Energy has asked us to represent them on the potential acquisition of TECO Energy. [Another investment bank] is advising TECO and has reached out to a very small group of buyers. . . ."

76. On or about July 13, 2015, STEVEN MCCLATCHEY, the defendant, received an email from another Investment Bank A employee with the subject line "one to add." The text of the email stated only "Duke-project lightening." MCCLATCHEY asked, "[w]hat's the project description, nothing coming up under that code name?" The employee wrote back, "[t]arget is TECO Energy, which is a Florida utility." MCCLATCHEY responded, "[a]ll set. It's called project Gator in our system."

77. The section of the Weekly Update for August 21, 2015 authored by STEVEN MCCLATCHEY, the defendant, lists "Duke Energy Corp - Acquisition of Teco Energy" as a "Potential Announcement" with a status of "FOC meet 8/19, final round bids due Aug 27."

78. On or about August 25, 2015, based on Inside Information provided by STEVEN MCCLATCHEY, the defendant, CW-1 purchased 2,000 shares of TECO in the CW-1 Joint Account for a total cost of $42,501.00. CW-1 had never purchased TECO for this account before.

79. On or about September 4, 2015, after the market's open, TECO announced it had been purchased by Duke Energy Corporation for $10.4 billion. By market close the following trading day, TECO's stock price had risen approximately 25% from the close of the prior trading day, to $26.34 per share.

### Profits from the Scheme

80. Based on my review of trading records for the CW-1 Account and the CW-1 Joint Account, I have learned that the total unrealized gains reaped from the insider trading scheme described herein were approximately $76,000.

WHEREFORE, I respectfully request that an arrest warrant be issued for STEVEN MCCLATCHEY, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

                                _____
                                MATTHEW CALLAHAN
                                Special Agent
                                Federal Bureau of Investigation

Sworn to before me this
27th day of May 2016

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

20